Kurt **RENFRO, William Southworth, Richard Peterson, and James Fitchuk, individually and as Class Representatives on behalf of other persons similarly situated, Plaintiffs,**

v.

**INDIANA MICHIGAN POWER COMPANY, d/b/a American Electric Power, Defendant.**

**No. 1:99–CV–877.**

United States District Court, W.D. Michigan, Southern Division.

Aug. 27, 2002.

Stephen D. Turner, Law, Weathers & Richardson, Grand Rapids, MI, for plaintiffs.

Joseph J. Vogan, Varnum, Riddering, Schmidt & Howlett, LLP, Grand Rapids, MI, for defendant.

*OPINION ON PARTIES' CROSS–MOTIONS FOR PARTIAL SUMMARY JUDGMENT*

MILES, Senior District Judge.

The plaintiffs, acting on behalf of both themselves and other similarly situated persons, have filed this action against their employer, Indiana Michigan Power Company, d/b/a American Electric Power ("AEP"), alleging violations of the overtime pay provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.* The matter came before the court on the following motions: (1) Plaintiffs' Motion for Partial Summary Judgment (docket no. 161), and (2) Defendant's Motion for Partial Summary Judgment as to Planners (docket no. 164).

The court issued its Order granting the defendant's motion and denying the plaintiffs' motion on August 8, 2002. This Opinion explains the court's reasons for its ruling.

**I**

Plaintiffs are employees of AEP, working at its Donald C. Cook Nuclear Plant (the "plant" or the "Cook plant") located in Bridgman, Michigan. The Cook plant was built and designed as a nuclear powered generating station providing power to customers in Michigan, Indiana, and other locations.

Plaintiffs' motion for partial relief is brought on behalf of named and opt-in plaintiffs to whom the parties refer as "planners."[1] Planners are generally responsible for the planning of certain maintenance work on equipment at the Cook

---

1. Specifically, plaintiffs seek partial summary judgment on behalf of planners Kurt Renfro; Richard Peterson; Terry Abernathy; James B. Adkins; Evan Arms; Carter Browne; Leonard A. Caccioppo; James E. Cavitt; Ralph E. Davidson, Jr.; James Eggleston; Steven Fulton; Michael Harper; Roger Ingalsbe; Alan Johnson; Dale Koern; Edwin Phillips; James Pope; Lawrence Prenger; Bruce Radde; Gregory Reese; Conrad Reid; E. Brian Roush; John Mark Sanders; Joseph Staub; Guy Troxell; and Larry Wilkes.

plant. Plaintiffs allege that they are classified by AEP as "exempt" employees under the FLSA.

The FLSA makes it unlawful for a covered employer to employ an individual "for a workweek longer than forty hours unless such employee receives compensation for his employment in excess [of 40 hours] at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). Plaintiffs allege that AEP willfully violated section 207(a) by failing to pay them overtime wages in accordance with that provision. While the FLSA exempts from the overtime pay requirement "any employee employed in a bona fide executive, administrative, or professional capacity," 29 U.S.C. § 213(a), plaintiffs allege that AEP has improperly classified them as exempt under section 213(a). Plaintiffs seek recovery of the amounts by which they were allegedly underpaid, as well as liquidated damages and attorneys' fees. They also seek injunctive relief under 29 U.S.C. § 217, restraining AEP from any further violation of the FLSA with respect to these plaintiffs.

## II

In their motion, the plaintiffs seek partial summary judgment on a number of issues, which include (1) AEP's liability for violating the FLSA; (2) the extension of the statute of limitations from two to three years based on the allegedly willful nature of AEP's violation; (3) AEP's liability for liquidated damages under the FLSA; (4) the inclusion of lunch periods during which the plaintiffs worked in the calculation of hours worked; (5) the proper method of calculating the planner/plaintiffs' damages; and (6) certain of AEP's affirmative de-

fenses, including good faith; latches; waiver and estoppel; failure to mitigate; and failure to exhaust administrative remedies. In its motion, AEP seeks summary judgment in its favor on the planners' claims for unpaid overtime.

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In evaluating a motion for summary judgment, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

One of the requirements for materials submitted for consideration in support of or in opposition to summary judgment is that those materials must provide facts which would be admissible in evidence. Moore v. Holbrook, 2 F.3d 697, 699 (6th Cir.1993). If the information would not be admissible, it may be disregarded.[2] One particular problem with plaintiffs' submis-

---

**2.** While the evidence submitted for consideration under Rule 56 need not be produced in a form that would be admissible at trial, *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), its

content must be admissible. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir.1997); *North American Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1283 (6th Cir.1997).

sions is their inclusion of numerous pages of documents pertaining to investigations conducted by the Department of Labor, in cases which do not appear to involve this defendant or this nuclear plant. At least two of these investigations appear to have resulted in some form of settlement. That plaintiffs are not relying on these investigations solely for their legal conclusions is apparent from plaintiffs' submission of underlying documents as well as plaintiffs' arguments regarding the thorough nature of the underlying investigations. *See* Plaintiffs' Reply in Support of Their Motion for Partial Summary Judgment, at 5–6. (It is questionable whether plaintiffs could rely on these materials as some form of legal precedent, for Department of Labor conclusions in unrelated cases they are not binding on the court in any event.) Plaintiffs' submission of such extraneous information, unaccompanied by a sufficient explanation of why such materials would be considered admissible at a trial, is troubling.[3]

Also troubling about the manner in which plaintiffs have chosen to present their case with respect to the summary judgment motions is their submission of vast amounts of material in a form which is at best cumbersome to review. One particular example involves plaintiffs' submission of the entire deposition transcript of each planner. Although as plaintiffs the planners are certainly in a position to provide relevant testimony in the case, the submission of each planner's deposition is inconsistent with plaintiffs' stated desire to have their claims tried as a collective action—with which AEP is in at least general agreement. *See* Plaintiffs' Motion Regarding Collective Action (docket no. 146); Defendant's Response to Plaintiffs' Motion Regarding Collective Action (docket no. 194). If, as plaintiffs have argued, "[w]ith a few exceptions [they] perform nearly identical tasks," one wonders why plaintiffs deemed it necessary or even wise to submit over two dozen of their own depositions, in their entirety, for the most part without pointing to those specific portions which they believe are pertinent for purposes of Rule 56.[4] In terms of sheer volume, the majority of exhibits have been submitted by plaintiffs in support of their response to AEP's motion.[5] However, a party opposing a summary judgment motion must point to "specific facts" showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Matsushita Electric*

---

3. Another example of plaintiffs' submission of documents of questionable admissibility is *Plaintiffs' Exhibit 82*, which consists of 14 pages of a September, 1999 General Accounting Office Report entitled "White-Collar Exemptions in the Modern Work Place." Plaintiffs rely on manufacturing industry statistics compiled in the report for the years 1983 and 1998.

   Although statistics have on occasion been used to establish patterns of discrimination by an employer in civil rights cases, plaintiffs' reliance on non-defendant-specific statistics in a case of this nature seems seriously misplaced. In any event, plaintiffs' statistics, submitted as they are unaccompanied by a sufficient analytic foundation, are "virtually meaningless." *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 963 (11th Cir.1997).

4. At one point, plaintiffs argue that "the Planners' deposition record in this case, taken as a whole" refutes AEP's contention that it is entitled to summary judgment. Plaintiffs' Response to Defendant's Motion for Partial Summary Judgment, at 23. However, plaintiffs themselves admit that the record includes 170 hours of planners' depositions. *Id.* Given plaintiffs' stated wish to avoid testing the court's resources and its patience, *see* Brief in Support of Plaintiffs' Motion Regarding Collective Action, at 8, plaintiffs submission of entire transcripts of numerous planners who might or might not be called to testify at a collective trial is difficult to comprehend.

5. Further complicating matters is plaintiffs' failure to provide an index or indexes to aid the court in its review of the unwieldy volumes of exhibits plaintiffs have submitted.

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Although the manner in which plaintiffs have attempted to make their case either for summary judgment in their favor or for trial leaves much to be desired, the court agrees with one statement they make: that "[t]he significance of the burden of proof cannot be overstated." Plaintiffs' Reply in Support of Their Motion for Partial Summary Judgment, at 1. The employer bears the burden of proving that an employee falls within an FLSA exemption. *Rutlin v. Prime Succession, Inc.*, 220 F.3d 737, 740 (6th Cir.2000); *Owsley v. San Antonio Independent School Dist.*, 187 F.3d 521, 523 (5th Cir. 1999). However, plaintiffs are wrong about the extent of this burden. Plaintiffs, relying on language contained in a footnote in a recent Sixth Circuit decision, argue that an employer must meet its burden by establishing exempt status through "clear and affirmative evidence." *Ale v. Tennessee Valley Authority*, 269 F.3d 680, 691 n. 4 (6th Cir.2001) ("The defendant must establish through 'clear and affirmative evidence' that the employee meets every requirement of an exemption"). However, what plaintiffs appear to be doing is confusing a rule of statutory construction (remedial statutes are construed broadly and their exemptions narrowly) with an increased burden of proof. While plaintiffs cite to the *Ale* footnote and a limited number of other cases which regurgitate the phrase "clear and affirmative" or some variation of it, tracing the history of this standard does not identify a persuasive origin. As another judge of this court recently observed, other circuits which have adopted this standard have done so without much elaboration on the rationale for doing so. *Schaefer v. Indiana Michigan Power Co.*, 197 F.Supp.2d 935, 938 n. 3 (W.D.Mich.2002). This is problematic, for as the Supreme Court has stated,

> Because the preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants, we presume that this standard is applicable in civil actions between private litigants unless 'particularly important individual interests or rights are at stake.'

*Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). Although an intermediate standard of proof, which typically employs some combination of the words "clear," "cogent," "unequivocal," and "convincing," is "no stranger to the civil law," the interests at stake in cases where the standard is employed "are deemed to be more substantial than mere loss of money," such as where reputation or liberty are in jeopardy. *Addington v. Texas*, 441 U.S. 418, 424, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979) (citations omitted); *see also Cooper v. Oklahoma*, 517 U.S. 348, 362–363, 116 S.Ct. 1373, 1381, 134 L.Ed.2d 498 (1996).[6]

---

6. *Ale* does not elaborate on the precise meaning of the "clear and affirmative" standard or indicate how it differs from the preponderance of the evidence standard which typically applies in civil cases. However, adopting a particular standard should be more than an empty semantic exercise. *Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979) (citation omitted). Plaintiffs argue that "clear and affirmative" means "proof which should leave no reasonable doubt in the mind of the trier of the facts concerning the truth of the matters in issue."

Although plaintiffs get their definition from Black's Law Dictionary, the definition sounds oddly similar to the "reasonable doubt" formulation, such as that contained in Sixth Circuit Pattern Criminal Jury Instruction 1.03, applied in criminal cases. Use of the term "clear" can imply "beyond a reasonable doubt." *Tatro v. Kervin*, 41 F.3d 9, 15 (1st Cir.1994). However, precisely how a "clear and affirmative" standard would be described for a factfinder is a matter which plaintiffs have not shared with the court.

Here, while the FLSA clearly has a remedial purpose and its exemptions must therefore be narrowly construed, it is unclear why plaintiffs believe that the statute's purposes are not adequately served by the long-recognized practice of shifting the burden of proof respecting exemptions to the employer. If the employer asserts an exemption and fails to prove the applicability of the exemption by a preponderance of the evidence, the employer is subject to liquidated damages under 29 U.S.C. § 216(b), which are viewed not as a penalty but rather as further compensation to the employee occasioned by the delay in receiving wages due. *Herman v. RSR Security Serv., Ltd.*, 172 F.3d 132, 142 (2d Cir.1999) (citation omitted). An employer seeking to avoid paying liquidated damages bears an additional burden of showing that it acted in "good faith" within the meaning of 29 U.S.C. § 260. Moreover, an employer may be held liable for compensation dating back an additional year, if the employee establishes that the violation was willful. 29 U.S.C. § 255(a); *see id.* at 141 (plaintiff bears the burden of proof on issue of willful behavior); *Bankston v. State of Illinois*, 60 F.3d 1249, 1253 (7th Cir.1995) (while FLSA defendants bore the burden at trial of showing that the plaintiffs were exempt employees, the plaintiffs bore the burden of showing that the defendants' conduct was wilful for purposes of the statute of limitations). Placing the burden of establishing defenses such as exemption and good faith on the employer while requiring the employee to establish willfulness fully protects employees' interests, and it seems certain that if Congress had intended to impose standards higher than those traditionally used in civil matters such as this, it would have clearly done so. Given the absence of a persuasive reason for doing so, the court declines to hold AEP to a heightened burden on the issue of exemption.

"FLSA claims typically involve complex mixed questions of fact and law." *Barrentine v. Arkansas–Best Freight Sys., Inc.*, 450 U.S. 728, 101 S.Ct. 1437, 1446, 67 L.Ed.2d 641 (1981). While the question of how employees spend their working time is a question of fact, "[t]he question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law ... governed by the pertinent regulations promulgated by the Wage and Hour Administrator." *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 106 S.Ct. 1527, 1530, 89 L.Ed.2d 739 (1986); *Reich v. State of Wyoming*, 993 F.2d 739, 741 (10th Cir.1993) (question of how game wardens spend their time is question of fact); *Dalheim v. KDFW–TV*, 918 F.2d 1220, 1226 (5th Cir.1990) ("the ultimate determination of whether an employee is exempt" is "properly characterized as a conclusion of law," even though "based on both historical fact and factual inferences"); *see Ale*, 269 F.3d at 691 ("ultimate question" of whether employee is exempt is a question of law).

Certainly, on summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)). A disputed factual issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987). However, reasonable factual inferences are one thing, and legal conclusions are another. It is the applica-

ble substantive law governing the issue which determines what facts are relevant.

Although both plaintiffs and the defendant have moved for summary judgment, this does not relieve the court of its responsibility to consider each motion in light of the theories advanced by that party. *See Bienkowski v. Northeastern University*, 285 F.3d 138, 140 (1st Cir.2002) ("The standards are the same where, as here, both parties have moved for summary judgment. 'The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard'") (citation omitted); *Promac, Inc. v. West*, 203 F.3d 786, 788 (Fed.Cir.2000) ("When both parties move for summary judgment, each party's motion must be evaluated on its own merits and all reasonable inferences must be resolved against the party whose motion is under consideration"). However, the court's task is somewhat easier here, where the principal theories advanced by the parties are opposite sides of the same issue: applicability of a particular exemption. Each side has contended that no genuine issue of material fact remains.

### III

In their motion, the plaintiff planners argue that they are not exempt employees, while in its motion AEP argues that the plaintiffs are exempt "administrative" and "professional" employees.[7] Therefore, although plaintiffs have raised additional issues in their motion pertaining to the question of damages, the issue of plaintiffs' status as exempt or non-exempt is primary, for if AEP properly classified plain-

tiffs as exempt, the remaining issues become moot.

■ Here, a wealth of information has been presented establishing what the planners do. What remains to be decided is the legal issue of whether these duties meet the requirements for the administrative exemption. The FLSA provides that the overtime pay requirement "shall not apply with respect to ... any employee employed in a bona fide executive, administrative, or professional capacity[.]" 29 U.S.C. § 213(a)(1). FLSA exemptions "are to be narrowly construed against the employers seeking to assert them[.]" *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960). The Secretary of Labor has promulgated rules and regulations which provide guidance in determining the applicability of the exemptions at issue.

### *"Administrative" Exemption*

According to 29 C.F.R. § 541.2,

The term *employee employed in a bona fide * * *administrative * * * capacity* in section 13(a) of the Act shall mean any employee:

(a) Whose primary duty consists of ...

(1) The performance of office or non-manual work directly related to management policies or general business operations of his employer or his employer's customers, ... and

(b) Who customarily and regularly exercises discretion and independent judgment; and ...

(c) (1) Who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or ad-

---

**7.** AEP does not dispute that the plaintiff planners have worked in excess of 40 hours in many work weeks during the relevant time period, without being paid overtime at 1½

times their hourly rate as required under 29 U.S.C. § 207(a)(1). AEP has, therefore, violated the FLSA unless it can prove that these plaintiffs are exempt employees.

**1182**

ministrative capacity (as such terms are defined in the regulations of this subpart), or

(2) Who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge, or

(3) Who executes under only general supervision special assignments and tasks; and

(d) Who does not devote more than 20 percent ... of his hours worked in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (c) of this section; and

(e)(1) Who is compensated for his services on a salary or fee basis at a rate of not less than $155 per week[.]

An employer seeking to establish an exemption must show that the circumstances of the employee's position satisfy either a five-part "long test," or, if the employee earns more than $250 per week, a three-part "short test." *Schaefer*, 197 F.Supp.2d at 939. Here, because it is undisputed that the plaintiff planners earn in excess of $250 per week, the short test applies. Under the "short test," the employer must prove (1) that it paid the plaintiffs on a salary or fee basis; (2) that plaintiffs' primary job duties consisted of nonmanual work directly related to the management policies or general business operations of the employer; and (3) plaintiffs' primary job duties required them to exercise discretion and independent judgment. 29 C.F.R. §§ 541.2(a)(1), 541.2(e)(2). *Ale*, 269 F.3d at 684.

Regarding the first element of the short test, plaintiffs argue that they should not be viewed as salaried employees because AEP imposes tight controls over their work schedules and they are not free to come and go as they please. However,

that is not the test for salaried status. Instead, 29 C.F.R. § 541.118(a) expressly provides that an employee "will be considered to be paid 'on a salary basis' within the meaning of the regulations if ... he regularly receives each pay period ... a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." The evidence clearly shows that plaintiffs fall within this definition.

■ That plaintiffs must work predetermined schedules and account for their time and may be subject to non-monetary discipline for failing to do so does not support a finding of non-salaried status. "The regulations prohibit monetary discipline of exempt employees[.]" *Haywood v. North American Van Lines, Inc.*, 121 F.3d 1066, 1070 (7th Cir.1997). "[I]f the regulations also were to prohibit non-monetary discipline for the quantity or quality of work an employee performs, employers would have no tool with which to combat chronic absenteeism, tardiness or poor performance." *Id.* Needing permission to leave early does not make plaintiffs non-salaried employees, nor does requiring plaintiffs to use leave time for certain absences. *See Webster v. Public School Employees of Washington, Inc.*, 247 F.3d 910, 917 (9th Cir. 2001) ("leave time is not salary"). AEP has met its burden of showing that no genuine issue of fact remains regarding whether the planners are salaried employees—they are salaried employees within the meaning of the regulations.

To meet its burden on the second element of the short test for administrative exemption, AEP must show that plaintiffs primary job duties consist of office or nonmanual work and that such duties relate either to AEP's management policies or its general business operations. 29 C.F.R. 541.2(a)(1).

In determining what is a "primary duty" within the meaning of the regulations pertaining to the administrative exemption, the court is also guided by the principles contained in 29 C.F.R. § 541.103, which provide that in the "ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent, of the employee's time." 29 C.F.R. §§ 541.206(b); 541.103. In their own motion, plaintiffs essentially ignore the "office or non-manual work" aspect of the second element of the short test. For its part, AEP points to evidence indicating that the planners do most of their work at their desks, which are located in an office complex at the plant. Under the applicable regulations, "[i]f the work performed is 'office' work it is immaterial whether it is manual or nonmanual in nature." 29 C.F.R. § 541.203(a). In addition, the regulations do not prohibit the performance of manual work by an "administrative" employee, so long as the employee does not perform so much manual work that he cannot be said to be basically a "white-collar" employee. 29 C.F.R. § 541.203(b).

The following is plaintiffs' own brief version of what their job is. As planners, they take job orders that identify work (either maintenance or new construction) to be done in the plant and prepare work packages that the plant's craft workers use to perform the work in the field. While plaintiffs themselves do not typically *physically prepare* the work packages, their work consists of identifying the materials, or documents, which must be included in the work packages. Guided by a computer database, the plaintiff planners both describe the job order activities that the craft workers will perform to complete the work

and identify Cook plant procedures that apply to work on the equipment component on which the craft workers will perform the work. The plaintiff planners also identify the various permits required before the craft workers can perform the work. Though plaintiffs occasionally perform other tasks as assigned, the planning of work packages, including its various phases, consumes approximately 95 percent of their time. Brief in Support of Plaintiffs' Motion for Partial Summary Judgment, at 2. This description hardly sounds like manual work.

Plaintiffs concede that much of their planning work is performed at a desk. Plaintiffs' Response to Defendant's Motion for Partial Summary Judgment, at 3. However, they argue that much of their work is manual work because they perform "field walk downs," which they contend consume a "fair portion" of their time. *Id.* The evidence to which plaintiffs cite in support of this argument appears to be the declaration of one planner, James Lee Eggleston, Jr., who states that "[a]s part of the planning process, planners are generally required to visually inspect, or walk down, the area where the work will be performed. Walk downs sometimes require planners to climb ladders or scaffolding or maneuver around obstructions to access a component." Plaintiffs' Exhibit 43.[8]

According to plaintiff Kurt Renfro, he spends at least 75 percent of his time at his desk. Plaintiffs' Motion, Exhibit 2 (Kurt Renfro Dep.), at 171. He spends the remainder of his time doing walkdowns and evaluating problems that arise in the plant, talking with engineers, and "looking up procedures, documents, [and] looking

**8.** The evidence indicates that a field walkdown is done to determine the requirements to complete a particular job. For one example, a walkdown would help determine whether a repair of a component located at a particular height could be done using existing ladders or whether scaffolding was necessary, or whether interfering components require participation of multiple crafts before a repair can be completed. Plaintiffs' Motion, Exhibit 8 (Donald Crouch Dep.), at 81–84.

through vendor manuals" located in maintenance and nuclear resource libraries maintained by the plant. *Id.* at 171–172. Other evidence in the form of testimony by planners indicates that they spend only a small minority of their time away from their desks. Reply Brief in Support of Defendant's Motion for Summary Judgment as to Planners, Exhibit 4 (Terry Abernathy Dep.), at 140 (90% of time spent at desk); Exhibit 5 (James Adkins Dep.), at 38 (20% of work done on production floor as opposed to work cubicle); Exhibit 6 (Stephen Fulton Dep.), at 96 (85% of time spent at desk or in office environment); Exhibit 7 (Dale Koern Dep.), at 145 (80% of time spent in office or administration building, as opposed to actual power plant). In addition, according to other evidence provided by plaintiffs themselves with their motion, planning is described as "primarily not in-plant. Primarily office environment, research-oriented ... some in-plant time, but not as worker, more tour work observation." Plaintiffs' Motion, Exhibit 11 (Terry Beilman Dep.), at 109–110. According to this evidence, planners are "generally not in-plant workers. Planners, by nature, are generally not the equivalent of an operator out in the plant or [a technician] or an electrician out in the plant that actually is out with tools doing hand work." *Id.* at 110–111. And that is according to plaintiffs' *own* submitted evidence. Because this evidence—and more—clearly shows that planners' duties are primarily non-manual, the court flatly rejects plaintiffs' argument that they perform "so much" manual work that they do not qualify for the administrative exemption.

To meet its burden on the second element of the short test for administrative exemption, AEP must also show that plaintiffs' primary job duties are "directly related to management policies or general business operations." 29 C.F.R. 541.2(a)(1). According to 29 C.F.R. § 541.205(a), this phrase "describes those types of activities relating to the administrative operations of a business as distinguished from 'production[.]'" However, the phrase also limits the exemption to persons "who perform work of substantial importance to the management or operation of the business[.]" *Id.* "The administrative operations of the business include the work performed by so-called white-collar employees engaged in 'servicing' a business," as, for example, "planning." 29 C.F.R. § 541.205(b). "An employee performing such work is engaged in activities relating to the administrative operations of the business notwithstanding that he is employed as an administrative assistant to an executive in the production department of the business." *Id.*

While the phrase "directly related to management policies or general business operations" limits the administrative exemption to persons "who perform work of substantial importance to the management or operation of the business[,]" 29 C.F.R. § 541.205(a), the phrase "is not limited to persons who participate in the formulation of management policies or in the operation of the business as a whole." 29 C.F.R. § 541.205(c). Instead,

> Employees whose work is 'directly related' to management policies or to general business operations include those whose work affects policy *or whose responsibility it is to execute or carry it out.* The phrase also includes a wide variety of persons who either carry out major assignments in conducting the operations of the business, or whose work affects business operations to a substantial degree, *even though their assignments are tasks related to the operation of a particular segment of the business.*

*Id.* (emphasis supplied); *see Douglas v. Argo–Tech Corp.,* 113 F.3d 67, 71–72 (6th Cir.1997) (exemption "is not reserved for

only those employees who formulate management policy.... It is enough that an employee's work affects management policy, or that an employee has the responsibility to execute policy decisions"). The regulations further explain the contours of the phrase "directly related to management policies or general business operations" as follows:

(1) It is not possible to lay down specific rules that will indicate the precise point at which work becomes of substantial importance to the management or operation of a business. It should be clear that the cashier of a bank performs work at a responsible level and may therefore be said to be performing work directly related to management policies or general business operations. On the other hand, the bank teller does not.

(2) An employee performing routine clerical duties obviously is not performing work of substantial importance to the management or operation of the business even though he may exercise some measure of discretion and judgment as to the manner in which he performs his clerical tasks..... An employee operating very expensive equipment may cause serious loss to his employer by the improper performance of his duties. An inspector, such as, for example, an inspector for an insurance company, may cause loss to his employer by the failure to perform his job properly. But such employees, obviously, are not performing work of such substantial importance to the management or operation of the business that it can be said to be 'directly related to management policies or general business operations' as that phrase is used in § 541.2.

\* \* \* \* \* \*

(5) The test of "directly related to management policies or general business operations" is also met by many persons employed as advisory specialists and consultants of various kinds, credit managers, safety directors, claim agents and adjusters, wage-rate analysts, tax experts, account executives of advertising agencies, customers' brokers in stock exchange firms, promotion men, and many others.

(6) It should be noted in this connection that an employer's volume of activities may make it necessary to employ a number of employees in some of these categories. *The fact that there are a number of other employees of the same employer carrying out assignments of the same relative importance or performing identical work does not affect the determination of whether they meet this test so long as the work of each such employee is of substantial importance to the management or operation of the business.*

29 C.F.R. § 541.205(c)(1)-(2), (5)-(6) (emphasis supplied).

Following these guidelines, it is clear that plaintiffs perform duties that are "administrative" in nature insofar as they do not themselves perform "production," even though their work supports maintenance and ultimately production at the plant. *See* Beilman Dep. at 111 ("I would classify them as maintenance support.... Maintenance is here to support Operations to enhance their ability, otherwise we couldn't produce electricity, and the planners are support to Maintenance doing that function"). It is also clear that plaintiffs perform work which is of "substantial importance to the management or operation of the business" because a fundamental part of their job is to make sure that AEP policy is followed. According to plaintiffs' own evidence, "one of the principal purposes of the planning process is to produce standard work packages to support the scheduled work[.]" Plaintiffs'

Motion, Exhibit 1 (Wayne Cretsinger Dep.), at 69. The position was created to make the maintenance function more efficient:

> ... [P]lanning maximizes the efficiency of the work group and does the administrative functions to allow the work group to more readily apply their trade to make them more efficient in doing the hands-on work.... But, here, typically, the preparatory work, the technical/administrative support function, if you will, provided by the planners is after identification of the problem, which typically here comes from Operations, and before the individual with the tools, and goes out to do the job....
>
> ... [T]here was a point in time where the percentage of the wrench turner's time, the hands-on, in-plant worker, a percentage of his time, ... went beyond five or ten percent that you normally say you can spend on administrative-type tasks, and it was more efficient for us to recognize that as a function and pull that small percentage from each worker and collect it in one spot and define a administrative technical support function to maximize the efficiency of workers.

*Id.* at 108–109. In addition, planners must ensure that all required plant procedures and processes are followed. Renfro Dep., at 411; Defendants' Response, Exhibit 14, at 28, Exhibit 22, at 133, Exhibit 23, at 123–124. They must also include applicable regulatory and administrative policy requirements in the job packages they prepare, which the craft personnel are responsible to follow. Plaintiffs' Response, Exhibit 64 (Roger Ingalsbe Deposition), at 127–128; Defendants' Response, Exhibit 14, at 443. These activities clearly place them within the administrative exemption. *See Cowart v. Ingalls Shipbuilding, Inc.,* 213 F.3d 261, 267 (5th Cir.2000) (production planners, who were responsible for planning in detail all production work requirements and ensuring that adequate information was provided to craft workers to enable them to meet contract requirements, fell within administrative exemption).

To meet its burden on the final element of the short test for administrative exemption, AEP must also show that plaintiffs' primary duties include work requiring the exercise of discretion and independent judgment. The regulations also provide guidance regarding this element. As 29 C.F.R. § 541.207(a) explains,

> In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered. The term used in the regulations in subpart A of this part, more over, implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance.

In addition, section 541.207(c) distinguishes the exercise of discretion and independent judgement from the use of skill in applying techniques, procedures, or specific standards:

> (1) Perhaps the most frequent cause of misapplication of the term 'discretion and independent judgment' is the failure to distinguish it from the use of skill in various respects. An employee who merely applies his knowledge in following prescribed procedures or determining which procedure to follow, or who determines whether specified standards are met ... is not exercising discretion and independent judgment within the meaning of § 541.2. This is true even if there is some leeway in reaching a conclusion, as when an acceptable standard includes a range or a tolerance above or below a specific standard.
>
> (2) A typical example of the application of skills and procedures is ordinary

inspection work of various kinds. Inspectors normally perform specialized work along standardized lines involving well-established techniques and procedures which have been catalogued and described in manuals or other sources. Such inspectors rely on techniques and skills acquired by special training or experience. They may have some leeway in the performance of their work but only within closely prescribed limits.

29 C.F.R. § 541.20(c)(1)-(2).

Section 541.207(d) also emphasizes that "the discretion and independent judgment exercised must be real and substantial, that is, they must be exercised with respect to matters of consequence." However, the exercise of discretion and independent judgment need not be at a "high level." In addition, 29 C.F.R. § 541.207(e) explains that the term "discretion and independent judgment ... does not necessarily imply that the decisions made by the employee must have a finality that goes with unlimited authority and a complete absence of review.... The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment within the meaning of the regulations[.]"

■ On the one hand, plaintiffs argue that many of the decisions they make as planners "do not involve real choices," those decisions apparently being too simple to justify being called true decisions. Plaintiffs also argue that many of the decisions they make involve the application of skill or knowledge in following prescribed procedures or determining which procedures to follow. However, an employee may be exercising discretion and independent judgment even when he is required to

follow procedures or work within guidelines; the question is whether the guidelines constrain the employee to the degree that they prevent him from exercising independent judgment. *See Haywood,* 121 F.3d at 1073; *Reich v. John Alden Life Ins. Co.,* 126 F.3d 1, 14 (1st Cir.1997); *Copas v. East Bay Municipal Util. Dist.,* 61 F.Supp.2d 1017, 1041 (N.D.Cal.1999).

The evidence presented indicates that planners exercise discretion and independent judgment during the course of their work even though they are required to follow company and regulatory policies. Importantly, the planners work independently. In addition, not all of the answers for every task faced by planners are addressed by existing written procedures. Defendants' Motion, Exhibit 9, at 66–68. In some instances, where there is no procedure, the planner must write out the steps of the task or determine what those are going to be. Defendants' Motion, Exhibit 20, at 149; Exhibit 21, at 37; Exhibit 29, at 138–141.

■ But perhaps even more importantly, it is the "before" nature of their work—performed in advance of the commission of resources to a particular job—that distinguishes plaintiffs from those types of employees, such as inspectors, discussed in 29 C.F.R. § 541.207(c). As expressly stated in § 541.207(a), "the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." Plaintiffs, as planners, are not simply determining whether work which has already been done falls within particular guidelines; instead, their decisions play a critical role in determining how AEP's resources will be committed *before that work is even begun.*[9] That

9. In their own motion, plaintiffs argue that their work is "no more important and in-

volves matters of significance no more than the work of the mechanic, electrician, or tech-

there are many jobs which must be done, and therefore many planners, does not detract from the overall importance of the function. The court concludes that the planners' positions fall within the administrative exemption and that AEP is entitled to summary judgment in its favor on the issue of liability on the planners' claims for unpaid overtime on the basis of this exemption.[10]

Although plaintiffs at one point argue that several of the planners were not exempt employees during workweeks in which they performed "manual" work clearing ice from around ice condenser baskets, plaintiffs' evidence in this regard consists of a brief statement by one of the planners, James Eggleston, that he and at least five other plaintiff/planners performed this "special task" (his own words) "[f]or a period of approximately a month or two in 1998." Plaintiffs' Motion, Exhibit 43. That Mr. Eggleston considered this a "special task" is notable, as is plaintiffs' failure to connect the time spent on this special task to particular overtime (which is interesting, insofar as plaintiffs cite to 29 C.F.R. § 778.103 in support of their non-exempt "workweek" argument; sec-

tion 778.103 deals with totaling workweek hours, not job duties).

■■■ The regulations address the administrative exemption in terms of "primary duty." 29 C.F.R. §§ 541.2(a); 541.206; 541.103. As one court has observed, there is nothing in the definition of "primary duty" which compels its evaluation in any particular time frame, such as a workweek. *Marshall v. Western Union Telegraph Co.*, 621 F.2d 1246, 1252 (3d Cir.1980). "[I]t is the usual or customary duties of an employee's job, rather than duties assumed on a sporadic or infrequent basis, which must be analyzed" in determining whether his primary duty places him within the short test for an exemption. *Masters v. City of Huntington*, 800 F.Supp. 363, 369 (S.D.W.Va.1992). By describing the ice-clearing task as "special" and indicating that it was of limited duration, plaintiffs necessarily concede that such manual, mindless work was the exception, and not part of their usual primary duties. In sum, performance of such work neither mandates entry of summary judgment in favor of plaintiffs, nor does it create a genuine issue for trial.

nician who performs the maintenance work." Brief in Support of Plaintiffs' Motion for Partial Summary Judgment, at 20. If this is an attempt to equate their positions with those of the actual craft workers, it falls far short. Plaintiffs do not perform the type of manual, in-plant work which is presumably done by mechanics, electricians, or technicians, and AEP has, for its own reasons, chosen not to leave planning in the hands of such craft workers, skilled as they may be at their own trades.

10. The parties have also sought summary judgment regarding the applicability of the professional exemption provided by 29 U.S.C. § 213(a)(1). While this exception shares certain elements with the administrative exemption, to establish a professional exemption AEP must show, among other things, that the

planners' work requires "knowledge of an advanced field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes." 29 C.F.R. § 541.3(a). AEP has not established this requirement, and the parties' submissions indicate that AEP will be unable to do so. Therefore, the court concludes that no genuine issue exists regarding the inapplicability of this exemption. Given the court's conclusion that the administrative exemption applies as a matter of law, the court sees no need to provide a more detailed explanation for its conclusion that the professional exemption does not apply.

### Conclusion

For the foregoing reasons, the court has granted AEP's motion for partial summary judgment and denied plaintiffs' corresponding motion.[11]

---

11. Because the court's resolution of the administrative exemption issue in favor of AEP renders unnecessary any resolution of the remaining issues raised by plaintiffs in their own motion, the court will not address those issues.